### KATE C. STURGIS v. WALKER F. MOORE.

#### No. 1478.

**Registration of Land Titles—Condemnation—State as Innocent Purchaser.**

The Republic of Texas, under the act of January 14, 1839, providing for a permanent location of the seat of government, condemned and paid for the title of land by proceedings against those holding same under grants from such Republic, to which proceedings the holders of a prior grant of the same land from the State of Coahuila and Texas, in 1835, were not made parties. The title papers of such older grant were not, at the time of the condemnation, deposited in the General Land Office nor registered in the county where the land was situated, nor did the Republic have actual notice of said prior grant. Held:

(1). The government of the Republic was not charged with notice of a title previously issued by a former government and was entitled to protection, as an innocent purchaser, against such unregistered title.

(2). Condemning the land for State purposes, it acquired the fee therein, and not a mere easement.

(3). The title of purchasers from the Republic of the rights acquired by the condemnation proceedings prevailed over that of the heirs of the grantee from the State of Coahuila and Texas.

APPEAL from the District Court of Travis County. Tried below before Hon. F. G. MORRIS.

Plaintiffs in a suit of trespass to try title appealed from a judgment in favor of defendant.

*J. J. Butts*, for appellants.—The Republic of Texas was a successor or a continuation of the former government, and it was charged with notice of the grant from the government of Mexico to T. J. Chambers, and cannot be protected as an innocent purchaser under the subsequent locations. Ellis v. Singletary, 45 Texas, 40; Paschal v. Perez, 7 Texas, 366; Dartmouth College v. Woodward, 4 Wheat., 518.

Under the laws in force in the Republic of Texas at the time it acquired its title to the land it could not have been an innocent purchaser under condemnation proceedings, and by its purchase it only took such interest as Edward Burleson had in and to the land. Constitution of Republic of Texas, Declaration of Rights, sec. 10; Constitution of Republic of Texas, Schedule, sec. 1; 1 White's Recopilacion, 91–93; 2 Id., 79–86; 5 Partidas, Title 5, Law, 19; 2 Alvarez' Spanish Law, 68;. Colonization Law of Coahuila and Texas of 1823, art. 22; Paschal's Digest, art. 532, p. 207; Act of January 20, 1840 (4 Cong.), p. 3; Sayles' Civil Statutes, art. 3128 (adopting Common Law); Act of January 14, 1839, sec. 4 (locating seat of government), 1 Sess. 3d Cong., pp. 161–162; Franklin v. Kesler, 25 Texas, 138; Evitts v. Roth, 61 Texas, 86; Ayers v. Duprey, 25 Texas, 605; Grace v. Wade, 45 Texas, 524; Nesbitt v. Richardson, 14 Texas, 660; Wallace v. Campbell, 54 Texas 91; Walton v. Reager, 20 Texas, 108; Railway v. Cave, 80 Texas, 140.

The Republic of Texas was charged with notice of every fact recited in the chain of title under which it claimed the land; it was charged with notice of the fact that the Goucher and Dunn certificates were located and the land surveyed before the time allowed by the registration law for filing deeds, etc., had expired, and at a time when there could have been no such thing as an innocent location of a certificate, or appropriation of land, as against a prior valid grant from the government. Carruth v. Grigsby, 57 Texas, 265; Renick v. Dawson, 55 Texas, 109; Willis v. Gray, 48 Texas, 469; Hill v. Moore, 85 Texas, 346.

The judgment of the court is contrary to, and not supported by the evidence, for this: The locations and surveys under which defendant claims title were made subsequent to the extension of the grant to Chambers, and before the time allowed by the registration law to file deeds and other evidence of title in the office of the county clerk for registration had expired; patent on the Goucher certificate was not issued until after the grant to Chambers had been deposited in the land office, and no patent has ever issued on the Dunn certificate; the State was on notice of the prior grant to Chambers and could not have been an innocent purchaser; and the grant was deposited in the land office before the purchase of the lots by Lamar, under whom defendant claims title.

Under the civil and statute law in force and effect at the time of the revolution, there was no such legal or equitable status as innocent purchaser of real estate. White's Recopilation, Vol. 1, pp. 91-93; Vol. 2, pp. 79, 86; 5 Partida, Title 5, Law 19; Alvarez' Spanish Law, Vol.

2, p. 68. Especially was this true where the elder title was by grant from the sovereign. Colonization Law of Coa. and Texas, 1823, art. 22; Paschal's Digest, art. 532. And thus the law remained and continued in force in Texas until after the condemnation proceedings, 1839, except as modified by the registration laws enacted by the Congress of the Republic.

The registration law of 1836 did not change the civil law, or statute law of Mexico and Coahuila and Texas, in respect to innocent purchasers of real estate in cases where prior valid grants from the government were involved; for grants from the sovereign were neither embraced within the language nor meaning of the statute (King v. Elson, 30 Texas, 254; Franklin v. Kesler, 25 Texas, 138; Evitt v. Roth, 61 Texas, 86; Railway v. Locke, 74 Texas, 398); and the joint resolution, or act, of December 14, 1837, requiring protocols to be deposited in the land office, was not addressed to owners of land, imposed no duties upon them, and made no reference to innocent purchasers, or subsequent purchasers of any kind; it was addressed to, and intended for, those who extended titles, and who were in lawful possession of archives, and imposed upon them the duty of depositing original title papers in the land office; the persons legally and rightfully in possession of such title papers were officers of the former government. And it cannot be deduced from the resolution, by any recognized canon of construction, that it was the intention of Congress to change the rule of law then in force in respect to titles to real estate. Acts of Congress, 1837, pp. 44-45; King v. Elson, 30 Texas, 254. There was no law in Texas making it the duty of owners of land to deposit the protocols of their titles in the land office until the act of October 20, 1866, was enacted. Acts of 1866, p. 5; Rev. Stats., art. 2322; King v. Elson, supra. Such being the state of the law at the time the Republic purchased the land, it cannot claim protection as an innocent purchaser within the meaning and intent of the registration laws.

Chambers had the right, both at law and in equity, to rely upon the legal presumption that the officers of the government, those in possession of the protocol of his title, would discharge the duties imposed upon them by the resolution of December 14, 1837, and deposit it in the land office; and the failure of the officer having possession and custody of the protocol to deposit it in the land office within the time prescribed by law, will not, and can not, work a forfeiture of his title to the land in controversy. Throckmorton v. Price, 28 Texas, 605; Franklin v. Kesler, 25 Texas, 138; Evitt v. Roth, 61 Texas, 86; Byrne v. Fagan, 16 Texas, 398-9.

Purchasers under condemnation proceedings were not purchasers within the meaning and intent of the registration law of 1836; the maxim caveat emptor applied to the purchaser at such sales; and the Republic of Texas only acquired such title by its purchase as those had who were parties to the proceedings, and whose title was condemned therein.

An examination of the cases will show that, in every case where purchasers at judicial sales have been held to be innocent purchasers, and to come within the protection of the registration laws, it has been so held because of the fact that at the time of the levy of the writ, and of fixing the lien, either the execution creditor, or the purchaser, had no notice of the prior conveyance; in either event the purchaser was protected, and protected because of the lien; in other words—they were protected either as lien creditors, or as purchasers who were subrogated to the rights of the lien creditor.   Grace v. Wade, 45 Texas, 524; Ayers v. Duprey, 25 Texas, 605; Wallace v. Campbell, 54 Texas, 91; Bradley v. Love, 60 Texas, 478.

The Republic had no title to the land which it could convey to the locators; the locations were made under such circumstances that the locators took no title, as against the prior grant to Chambers; they could not claim the protection of the registration laws; then the Republic re-purchases from the locators, and by virtue of such a transaction it is contended that the Republic is an innocent purchaser, and that plaintiffs in error holding under a prior valid grant from the sovereign, must be postponed in favor of those holding under it.   In our humble judgment such is not the law.   Ellis v. Singletary, 45 Texas, 41; 1 Story's Equity, 420.

Only a purchaser of the legal title can claim protection as an innocent purchaser.   (York v. McNutt, 16 Texas, 16, and authorities cited.)   At the time of the condemnation proceedings no patent had issued to the locators of the certificates.   Their title was, at most, an equitable one; the legal title remains in the government until patents issue. Hence the Republic was not, and could not have been, an innocent purchaser.

The Republic of Texas, being a mere continuation, or successor, of the former government; grants from the government being official acts; and all grants emanating from the government of Coahuila and Texas being recognized and respected by the Republic, and protected by its laws, organic and statutory, it was charged with notice of the grant to Chambers; and a vendor with notice of a prior title who sells to one without notice, and then re-purchases, takes no title; all equities re-attach as soon as the property comes back into his hands.   Ellis v. Singletary, 45 Texas, 40.

FISHER, CHIEF JUSTICE.—STATEMENT OF CASE.   This is an action of trespass to try title by appellants as the heirs of T. J. Chambers, to recover the land in controversy as a part of Chambers' grant, issued to him in 1835 by the Government of Coahuila and Texas.   Subsequent to this grant and during the existence of the Republic of Texas, as will appear by the facts, the land was located upon by two certificates, one issued in favor of Goucher and one in favor of Dunn.

The Republic, as a part of its seat of government, caused this land to be condemned, and under this decree of condemnation the land was

sold, and it is under these proceedings that appellee deraigns title. The condemnation related to the Goucher and Dunn locations and to which proceeding Chambers was not a party.

Appellee recovered judgment below on grounds which are stated by the trial court in its conclusions of law.    The following are the facts:

"1.    That plaintiffs, Kate C. Sturgis and Stella J. Chambers, are the sole surviving heirs at law of T. J. Chambers, deceased, grantee named in the grant under which they claim title to the lands sued for in this cause.

"2.    That the signature of I. R. Lewis to the grant to T. J. Chambers, under which plaintiffs claim title to the land sued for, is the genuine signature of I. R. Lewis.

"3.    That the land sued for by plaintiffs is upon and a part of the land mentioned and described in the aforesaid grant to T. J. Chambers.

"4.    That lot No. 4, mentioned and described in plaintiffs' petition, is upon and a part of the land covered by the location of the Samuel Goucher certificate; and that the other lot mentioned and described in plaintiffs' petition is upon a part of the land covered by the location of the Josiah G. Dunn certificate.

"5.    That the Samuel Goucher certificate was a first-class headright certificate for one-third of a league of land.    Said certificate was issued by the Board of Land Commissioners of Bastrop County on January 2, 1838.    Said certificate was located, the land surveyed, and the field notes approved by the surveyor of Bastrop Land District on March 2, 1838, and patent issued for said land on May 6, 1841.

"6.    That the Josiah G. Dunn certificate was a first-class headright certificate for one league and labor of land; that the certificate was located and the land surveyed by the deputy surveyor on March 24, 1838, and the field notes approved by the surveyor of the "of the" Bastrop Land District on the 3rd day of April, 1840, and that no patent has ever issued for said land.

"7.    That the Republic of Texas condemned the land covered by the aforesaid Goucher and Dunn certificates on the 3rd day of April, 1839, under the provisions of an Act of Congress providing for the permanent location of the seat of government, approved January 14, 1839, making Edward Burleson, assignee of said certificates, a party to said condemnation proceedings, but that the said T. J. Chambers, who was living at that time, was not made a party to said condemnation proceedings and that no notice of said condemnation proceedings was given to said Chambers, and that he did not appear in or in any way become a party to said condemnation proceedings, and that the interest of said T. J. Chambers in and to the said lands, if any he had, was not condemned in or by said condemnation proceedings.

"8.    That the Republic of Texas paid to the said Burleson the value of said lands as determined in and by the aforesaid condemnation proceedings.

"9.    That on the 5th day of April, 1839, the sheriff of Bastrop

County, by virtue of the aforesaid condemnation proceedings, and in pursuance of the aforesaid act providing for the permanent location of the seat of government, conveyed said lands to the Republic of Texas.

"10.    That on the....of........., 1841, the Republic of Texas sold the said lots mentioned and described in plaintiffs' petition to M. B. Lamar, who paid the full and fair value therefor, and on the 10th day of February, 1846, the Republic of Texas issued to said M. B. Lamar a patent for said lots.

"11.    That defendant claims the lots sued for under and through the aforesaid M. B. Lamar, by a regular and unbroken chain of title.

"12.    That the reasonable cost and expense of locating and surveying the land appropriated by the Goucher certificate, at the time of its location was $200; and that the reasonable cost and expense of locating and surveying the land appropriated by the Dunn certificate, at the time of its location, was $75, which the owner of the said certificate paid at the time the said land was located and surveyed.

"13.    That at the time the said Goucher and Dunn certificates were located and the land surveyed, and the costs of locating and surveying the said lands was paid as aforesaid, the owner of said certificates had no actual notice of the existence of the said T. J. Chambers' grant or title.

"14.    That the T. J. Chambers grant or title papers have never been filed for registration in the county in which the land is situated.

"15.    That when the defendant purchased the lots sued for, he paid the full and fair value therefor.

"16.    That the defendant, and those under whom he claims title to the lots sued for, have claimed and asserted ownership to the said lots and paid the taxes thereof regularly as they became due and payable, for thirty years.

"17.    That T. J. Chambers, father of plaintiffs, was a citizen of Texas at and from the year 1834 until his death; that he died in the year 1865; and that from and during the period beginning at the death of the said T. J. Chambers until the first day of January, 1868, the plaintiffs and each of them were under twenty-one years of age and unmarried, and during said time were under the disabilities of minority.

"18.    That the land herein sued for was located in S. J. Austin's little colony.

"19.    That the land covered by the T. J. Chambers grant fronts on the Colorado river more than one-fourth of its depth."

The following facts were given in evidence:

M. E. Gross, a witness for plaintiff, testified as follows: "I am Chief Clerk of the General Land Office, State of Texas. The book I have here is one of the volumes of Spanish grants belonging to the Spanish archives of the State of Texas. I got it out of the Land office and brought it here by command of a subpœna duces tecum issued in this case. The book contains a grant to T. J. Chambers for eight leagues of land in Travis County."

Plaintiff then offered in evidence the original and following translated copy of said grant:

"First Stamp.                                (L. S.)    For the biennial term
"Six Dollars.                                                   of 1834 and 1835.

"Most Excellent Sir:    Citizen 'Licenciado' Thomas Jefferson Chambers, Superior Judge of the Judiciary Circuit, of Texas, with due respect, would represent to your Excellency:    That, intending to proceed on my circuit for the purpose of entering into the discharge of my duties, and whereas it is necessary to establish the manner of receiving my salary for my support, which I am to receive in lands according to the law on the subject, I request that your Excellency be pleased to appoint a Commissioner and in his default any of the Alcaldes of Texas, to issue to me the corresponding titles; wherein I shall receive justice and favor. Monclova, June 29th, 1834, Lic. Thomas Jefferson Chambers, to his Excellency, the Governor of the Free State of Coahuila and Texas. Monclova, July 29th, 1834.    As is applied for, and to this effect, I appoint citizen Ira R. Lewis and in his default, any Alcalde of the Municipality within whose jurisdiction the land applied for may be situated, to issue to him the corresponding titles according to the laws.    Let a copy be delivered to the party interested of his petition and this decree, in order that, by appearing with it before the Commissioner, he may obtain the consequent effects.    Vidaurri, Juan Antonio Padillo, Sec. This is a copy of the original, which I certify.    Monclova July 30th, 1834, J. Antonio Padillo, Sec.

"To Citizen Ira R. Lewis, Special Commissioner: Citizen 'Licenciado' Thomas Jefferson Chambers, Superior Judge of Texas, with due respect would represent to you: That, having to receive public lands for my salary as such Judge, by virtue of the law of April 17th, 1834, and having selected a tract of land on the Colorado River, I request that you be pleased to put me in possession of it and to issue the corresponding title in conformity to the law, and to the commission conferred upon you by the Supreme Government to this effect, by decree of the 29th of July, current year 1834, wherein I shall receive justice and favor. San Felipe, the 18th day of June, 1835.    T. Jefferson Chambers.

"I, Citizen Ira R. Lewis, commissioned by the Supreme Government of the Free State of Coahuila and Texas, by decree of the 29th of July, 1834, to put Citizen 'Licenciado' Thomas Jefferson Chambers in possession of the lands which he is to receive for his salary as superior Judge of Texas, according to the law of April 17th, 1834; at the request of the party interested, I resolve to put him in possession of a tract of land designated by him, on the East bank against the falls, on the Colorado River; and the tract of land being vacant, I cause it to be scientifically surveyed in the form and under the boundaries that follow: beginning the survey on a stake set on the bank of said river, two varas above the mouth of Falls Creek and taking a course South; ran 1500 varas to where a stake was set; thence course N. 45 E. 2500 varas to where another stake was set for corner; thence course S. 45 E. 1500 varas to where a stake was set;

thence 1500 varas, course S. 21¼ E., and set another stake for corner; thence course S. 1500 varas to where a stake was set; thence 1500 varas course S. 21½ W. to where another stake was set for corner; thence course S. 45 W. 1500 varas and set stake; thence to the river, course S. 21½ W. to where another stake was set for corner; thence, taking the river upwards on its bank and following the meanders thereof, to intersect the place of beginning; this tract remaining in the shape represented on the accompanying diagram, and contains within these lines an area of two hundred million square varas.

"Therefore, exercising the powers in me vested by the law, and in compliance with the aforesaid decree of the Supreme Government, in the name of the Free State of Coahuila and Texas, I placed and put the said citizen, 'Licenciado' Thomas Jefferson Chambers, Superior Judge of Texas, in real and true possession of said tract of land, under the limits and boundaries and according to the survey above stated, and I grant and transfer the same unto him forever. Let a testimonio of the present instrument, and of the other documents referring to this tract of land, be transcribed, in order that, by delivering it to the party interested, he may use it as a title in form, and that, holding possession of said tract of land, he may at his will, enjoy, exchange, alienate, use and dispose of the same unto him, his heirs and assigns, or any person who, under him or them, interest or right may hold.

"Given at the town of San Felipe de Austin, the 20th day of the month of June, 1835.

"I. R. Lewis; attesting, Manuel M. Valdez, attesting, William L. Caznean.

"This is a copy of the original documents therein expressed, concerning the tract of land to which they refer; let it be delivered to the party interested in conformity to my foregoing order on the subject, to be used by him as a title in due form.

"Given at the town of San Felipe de Austin, the 20th day of the month of June, 1835.                              I. R. Lewis.

"Attesting: Manuel M. Flores.

"Attesting: William L. Cazenean.

"(Endorsement in the English language.)

"Personally appeared before me, Snalas de Gervais, Chief Justice and ex-Officio Notary Public for the County of Matagorda, the above named I. R. Lewis and acknowledged the above signature to be his act and deed and made for the purposes therein mentioned. June 19th, 1838.

"Snalas de Gervais,

"C. J. and Ex-Officio and Notary Public, State of Texas."

"General Land Office, Austin, Texas, February 20, 1891.

"I certify that the foregoing is a correct translated copy of the testimonio of title to Thomas Jefferson Chambers, deposited in this office on the 7th day of February, 1840.

"Ex. B. De Bray, Spanish Translator."

"I, W. L. McGaughey, Commissioner of the General Land Office of the State of Texas, do hereby certify that Ex. B. De Bray, whose signature is subscribed to the foregoing certificate, is the Spanish translator of this office, duly qualified according to law, and that his official acts as such are entitled to full faith and credit.

"In testimony whereof, I have hereto set my hand and caused the seal of this office to be affixed on the day and date above written.

[Seal]                              "W. L. McGAUGHEY, Commissioner."

It was agreed by and between the parties of this suit that the translated copy was a true and correct translation and copy of the original instrument, whether the original was a protocol or testimonio, as the same appears on file in the Spanish archives of the General Land Office and exhibited in court by the witness Gross, and that said instrument was the only evidence of the Chambers grant ever deposited in the General Land Office.

And it was agreed that a great many words in said grant, including the calls in the field notes, appear to have been written in different colored ink and by different persons from that of the body of the instrument, which was not explained by foot notes at the bottom of said instruments.

Defendant shows in evidence the act of 1857, entitled "An Act to quiet titles to real estate in the City of Austin."

*Opinion.*—The disposition we make of the case relieves us of the necessity of deciding the many questions presented in the brief of appellants, and in deciding whether the instrument in the record evidencing the title of Chambers is a protocol or testimonio and the legal effect of such instruments. It is clear from the facts that this title paper of Chambers was not deposited in the land office until after the land had been condemned and sold to the Republic under the proceedings authorized and required by the law of January 14th, 1839, nor was such title then recorded in the county where the land was situated. The effect of the various laws of the Republic, in existence at the time the government acquired its title under the condemnation proceedings, relating to the deposit in the land office of then existing titles and registering titles in the county where the land was situated, was to relieve subsequent locators and purchasers without notice for value of the effect of such previous titles which were not so deposited or recorded as required by law. Guilbeau v. Mays, 15 Texas, 411. The title condemned and acquired by the Republic was that of the apparent owners as shown by the record and the evidences of title then apparently existing.

Under the facts as shown, we are authorized to indulge in the assumption that the government, in acquiring the title by condemnation, and when the land was paid for through its officers, did not have notice of the existence of the Chambers grant, and it is clear that the Republic paid value for the land. Under these circumstances was the government entitled to the protection granted to an innocent purchaser? Ordinarily

it is true that a government can not be a purchaser without notice of a grant which it had previously issued, but this rule can not apply in this case, for here the previous grant was not issued by the Republic, the government that acquired the subsequent title, but was issued by another government.

The general rule is, that where a government condemns land for State purposes, it acquires not only the easement and use, but also the absolute title and fee to the property. Mills, Eminent Domain (2nd edition) sec. 50. Another rule to be observed in determining the effect of the title of the Republic is, that if it appears from the statute that authorizes the condemnation the purpose was to acquire title it will be so construed and held to embrace the condemnation of title as well as easement. It is clear from a reading of the Act of the Congress of the Republic that authorized the condemnation that the purpose was to permanently acquire the title to the property and lands condemned. If the Republic was authorized to become a purchaser of real estate, and was not as a matter of law charged with a notice of title previously issued by another government, it, or an individual who, for value, purchased from one in whom rested the apparent title, without notice of the existence of a previous unrecorded grant, the evidence of which was not on file in the land office or in the county where it was required to be registered, would be protected. This rule of protection will also extend to a purchaser who acquired the apparent title under execution sale without notice of the unrecorded previous grant. The government, by the condemnation proceedings against those who were then the apparent owners of the land, became the purchaser thereof for value and apparently without notice of the existence of the Chambers title. This being true we do not see why the principles announced would not apply to its title and it be accorded the same protection as would be extended in case of other bona fide purchasers. Holding as we do that the government was an innocent purchaser of the land practically settles and disposes of the case. The protection extended to the government would follow any subsequent title it passed to its vendees.

*Judgment affirmed.*

Decided April 8, 1896.

Writ of error refused.